STATE EX REL. the WISCONSIN SENATE and
its President, Senator Fred A. Risser; the
Wisconsin Assembly and its Speaker,
Representative Thomas A. Loftus, and the
Joint Committee on Legislative Organization,
Petitioners,

v.

Tommy G. THOMPSON, Governor of the State of
Wisconsin; and James R. Klauser, Secretary,
Department of Administration, Respondents.

Supreme Court

*No. 87–1750–OA. Argued October 20, 1987.—Decided June 14, 1988.*

(Also reported in 424 N.W.2d 385.)

431

For the petitioners there were briefs by *Eugenia G. Carter, Brady C. Williamson, Jeffrey J. Kassel* and *LaFollette & Sinykin,* Madison and oral argument by *Brady C. Williamson.*

For the respondents the cause was argued by *Edward S. Marion,* assistant attorney general, with whom on the briefs was *Donald J. Hanaway,* attorney general.

Amicus curiae briefs were filed by *William J. Davis* for the Wisconsin's Environmental Decade, Madison; *Kenneth Doran, William M. Smoler* and *Smoler & Albert, S.C.,* for the League of Women Voters of Wisconsin, Inc., Madison; *David Prosser, Jr.,* Appleton; *Bruce Meredith, William S. Sample* for the Wisconsin Education Association Council, Madison and *Senator Donald K. Stitt,* Madison.

HEFFERNAN, CHIEF JUSTICE. This is an original action for declaratory judgment and supplemental injunctive relief. We declare the rights of the parties and declare that the petitioners are not entitled to the prayed for relief.

The petitioners are the Wisconsin Senate and its president, Senator Frederick A. Risser, who is also a Wisconsin resident and taxpayer; the Wisconsin Assembly and its speaker, Representative Thomas A. Loftus, who is also a Wisconsin resident and taxpayer;

and the Joint Committee on Legislative Organization, which is created by sec. 13.80, Stats. The petitioners seek a declaration from this court that Governor Tommy Thompson exceeded his constitutional partial veto authority when he vetoed phrases, digits, letters, and word fragments in the 1987–89 biennial budget bill.[1]

This declaratory judgment action challenges the validity of 37[2] of the 290 partial vetoes the governor

[1]The petitioners also seek a declaration that the governor does not have the unilateral authority to order in his veto message that the Secretary of the Department of Administration place the appropriated funds from the vetoed programs and functions into unallotted reserves for later lapse into the general fund. We do not reach this so-called "impoundment" issue. It does not present a justiciable controversy because the issue is not ripe for judicial determination, *see Loy v. Bunderson,* 107 Wis. 2d 400, 410, 320 N.W.2d 175 (1982), in light of the governor's repeated disclaimers in the brief submitted on his behalf that these directions were not intended to be mandatory or controlling on the Secretary. Furthermore, the parties have stipulated that the Secretary of the Department of Administration considers the governor's veto message to be merely a "non-binding" source of gubernatorial intent and only one of the factors the Secretary may take into account when making allocation decisions on a continuing basis throughout the year pursuant to sec. 16.50, Stats. The parties also stipulated that other than the budget bill itself, there are no separate, identifiable expressions of budgetary intent from the legislature or the Joint Committee on Finance that are inconsistent with these directives from the governor. We conclude, therefore, that the governor's concession that he was not claiming any authority to impound appropriated funds and the parties' stipulations make it unnecessary for this court to resolve this issue in this case.

[2]The 37 partial vetoes challenged in this action are:

Item A–1, A–6, A–16, A–23, A–44, Item C–6, C–9, C–26, C–27, C–29, Item D–2, D–10, D–21, D–27, D–30, D–35, D–36, D–38, D–40,

exercised in acting on 1987 Wisconsin Act 27, the biennial omnibus budget bill. The petitioners' primary contention is that the governor's vetoes were invalid because the governor has no authority under art. V, sec. 10 of the Wisconsin Constitution to veto individual letters, digits or words, and has no authority to reduce appropriation amounts. The governor, on the other hand, maintains that under the constitution and the standards set forth in *State ex rel. Kleczka v. Conta,* 82 Wis. 2d 679, 264 N.W.2d 539 (1978), and its progenitors, he can veto any part of an appropriation bill, including words, letters, or numbers, even if that veto results in a reduction in an appropriation, as long as what remains after the veto is a "complete, entire, and workable law."

This court granted the petitioners leave to commence this original action.[3] The court also permitted the governor to brief any affirmative defenses he wished to raise. The governor has interposed the following four affirmative defenses to this court exer-

D–44, D–46, D–69, D–72, D–73, Item E–16, E–22, E–23, E–24, E–28, E–42, E–43, E–49, E–52, E–56, E–66, E–69, and E–83.

[3]This matter is *publici juris* and requires a prompt and authoritative determination by this court in the first instance. *Petition of Heil,* 230 Wis. 428, 284 N.W. 42 (1934); *see also, In re Exercise of Original Jurisdiction,* 201 Wis. 123, 229 N.W. 643 (1930). Nonetheless, we repeat the admonition expressed by the Florida Supreme Court when it was called upon to determine the validity of six vetoes exercised by that state's governor of items in a budget bill:

". . . it would be a serious mistake to interpret our acceptance of jurisdiction in this cause as a general willingness to thrust the court into the political arena and referee on a biennial basis the assertions of power of the executive and legislative branches in relation to the appropriations act." *Brownson v. Firestone,* 382 So. 2d 654, 671 (Fla. 1980).

cising its original jurisdiction in this case: Petitioners' lack of capacity to sue; petitioners' lack of standing; the claim that constitutional principles of separation of powers would be violated by permitting the legislative branch of government to sue the executive branch before the judicial branch; and lack of a justiciable controversy.

If this court were to accept any or all of these affirmative defenses, the governor's challenged partial vetoes in this action would be insulated or immunized from this court's review and possible invalidation.[4] Although we recognize the seriousness and complexity of these affirmative defenses, we nevertheless decline, and find it unnecessary in this case, to resolve questions of the apparent authority of those purporting to represent the legislature—i.e., the Senate and Assembly and their respective leadership as well as the Joint Committee on Legislative Organization,—to bring and maintain this declaratory judgment action. This apparent authority springs from a resolution adopted by the Joint Committee on Legislative Organization on September 1, 1987, authorizing the Assembly Speaker and the Senate President to retain counsel to represent the legislature, the joint committee itself, and any other appropriate parties in this litigation. We have in the past refused to intermeddle in what we consider to be purely intralegislative concerns. *State ex rel. La Follette v. Stitt,*

---

[4]Of the 37 specifically challenged partial vetoes in this case, only items D–35, D–36, E–23 and E–83 were submitted to the legislature for possible override pursuant to art. V, sec. 10. An additional 21 of the 290 partial vetoes exercised by the governor were also submitted to the legislature for possible override. None of these 25 partial vetoes was overridden by the legislature.

114 Wis. 2d 358, 364, 338 N.W.2d 684 (1983). In this case, we will not go behind that committee action. We note in passing, however, that this action was brought by Frederick Risser and Thomas Loftus in their individual capacities as taxpayers as well as in their official capacities. Additionally, we conclude that those two individuals as residents and taxpayers have met the requirements for standing to bring this declaratory judgment action. *See, Milwaukee Brewers Baseball Club v. DH&SS,* 130 Wis. 2d 56, 65, 387 N.W.2d 245 (1986). Furthermore, we need not consider the absence of any specific allegation in the petition that Risser or Loftus, either individually or as a class, have suffered pecuniary loss, to be fatal. *Thompson v. Kenosha County,* 64 Wis. 2d 673, 679, 221 N.W.2d 845 (1974); *see also, S.T. Realty Co. v. Sewerage Commission,* 15 Wis. 2d 15, 22, 112 N.W.2d 177 (1961). Cf. *City of Appleton v. Town of Menasha,* 142 Wis. 2d 870, 419 N.W.2d 249 (1988).

Moreover, it is this court's function to develop and clarify the law. *See State v. Mosley,* 102 Wis. 2d 636, 665, 307 N.W.2d 200 (1981) and *State v. McConnohie,* 113 Wis. 2d 362, 334 N.W.2d 903 (1983). Since *Marbury v. Madison,* 5 U.S. (1 Cranch) 137 (1803), it has been recognized that it is peculiarly the province of the judiciary to interpret the constitution and say what the law is. We deem it to be this court's duty to resolve disputes regarding the constitutional functions of different branches of state government; we may not avoid this duty simply because one or both parties are coordinate branches of government. *See Barnes v. Kline,* 759 F.2d 21 (D.C. Cir. 1984). It is the responsibility of the judiciary to act, notwithstanding the fact that the case involves political considerations or that

436

final judgment may have practical political consequences. *See Dye v. State ex rel. Hall,* 507 So. 2d 346 (Miss. 1987). We conclude that this declaratory judgment action presents a justiciable controversy. *Loy v. Bunderson, supra.*

Accordingly, because the parties have stipulated to all the facts necessary to determine the issues raised in this petition and have agreed that none is in dispute, we reach the merits.

We conclude that the governor properly exercised his partial veto authority pursuant to art. V, sec. 10 of the Wisconsin Constitution with respect to the 37 specifically identified vetoes challenged in this case. We consider that this result has been presaged by our prior decisions regarding the scope of the governor's partial veto authority. Thus, in this opinion, we break no new ground except as we now, on the facts before us, have obligation to clarify that the governor may, in the exercise of his partial veto authority over appropriation bills, veto individual words, letters and digits, and also may reduce appropriations by striking digits, as long as what remains after veto is a complete, entire, and workable law. *State ex rel. Kleczka v. Conta, supra.* We also accept, and for the first time in this case give explicit judicial recognition to, the long-standing practical and administrative interpretation or *modus vivendi* between governors and legislatures, that the consequences of any partial veto must be a law that is germane to the topic or subject matter of the vetoed provisions.

Because we conclude that the result in this case has been augured by our prior decisions, we begin our discussion with a brief review of those prior cases discussing the governor's partial veto authority in this state.

In the general election of 1930, the electorate of this state approved the adoption of an amendment to art. V, sec. 10 of the Wisconsin Constitution. That amendment added the following language to the Wisconsin Constitution:

> "Appropriation bills may be approved in whole or in part by the governor, and the part approved shall become law, and the part objected to shall be returned in the same manner as provided for other bills."

Prior to this amendment, the governor had only the authority to reject an entire bill. By this amendment to art. V., sec. 10, Wisconsin joined 38 other states (now totalling 43), which provide their governors with what is generically, although sometimes inaccurately, known as an "item" veto authority over appropriation bills. *See Committee Print,* (1986) U.S. House of Representatives, 99th Congress, 2nd Session, "Item Veto: State Experience and Its Application to the Federal Situation." (Hereafter cited as *Committee Print).* The partial veto authority was adopted in this state to provide the governor with some flexibility in dealing with the legislature's practice of including different subjects of legislation in one appropriation bill. As early as 1913, Governor Frances E. McGovern had complained of this practice and noted that the lack of a partial veto authority required him to approve such "omnibus" appropriation bills in toto even though he might have objected to certain subjects of the legislation contained therein. *See* A. Harrington, "The Propriety of the Negative-the Governor's Partial Veto Authority," 60 *Marq. L. Rev.* 865, 876 (1977). (Hereafter, Harrington.)

The first case to consider this new constitutional provision was *State ex rel. Wisconsin Telephone Co. v. Henry,* 218 Wis. 302, 260 N.W. 486 (1935). In that depression-era case, the telephone company brought an original action in this court challenging Governor Phillip LaFollette's vetoes of parts of an appropriation bill aimed at providing funds which were necessary for immediate emergency relief. Governor LaFollette vetoed parts of the bill which did not contain specific appropriations. Those vetoes were challenged on the ground that they were unconstitutional because the governor did not have the authority to approve the appropriation and disapprove a proviso or a condition inseparably connected to the appropriation. Additionally, it was argued that the governor did not have the authority to disapprove parts of an appropriation bill not containing an appropriation.

In rejecting these arguments, this court in *Henry* indelibly set the broad scope of the Wisconsin governor's partial veto authority under art. V., sec. 10. The *Henry* court specifically drew a distinction between the "item" veto authority granted governors in other states and the "broader" term "part" veto authority granted the governor of this state. In *Henry,* this court stated:

> "[I]f, in conferring partial veto power, by the amendment of sec. 10, art. V, Wisconsin constitution, in 1930, it was intended to give the executive such power only in respect to an item or part of an item in an appropriation bill, then why was not some such term as either 'item' or 'part of an item' embodied in that amendment, as was theretofore done in similar constitutional provisions in so many other states, instead of using the plain and unambiguous term 'part' and 'part of the bill

objected to,' without any words qualifying or limiting the well-known meaning and scope of the word 'part?'" 218 Wis. at 313.

Further, this court adopted the dictionary's broadly stated definition of the word "part":

> "'One of the portions, equal or unequal, into which anything is divided, or regarded as divided; something less than a whole; a number, quantity, mass, or the like, regarded as going to make up, with others or another, a larger number, quantity, mass, etc., whether actually separate or not; a piece, fragment, fraction, member, or constituent.'" *Id.*

This court also sent a clear signal that although this expansive partial veto power may not have been intended by the framers of sec. 10, art. V of the constitution, nevertheless, that was the result:

> "It may well be that sec. 10, art. V, Wisconsin constitution, was not intended to empower the governor, in vetoing parts of an appropriation bill, to dissever or dismember a single piece of legislation which is not severable, or so as to leave merely provisions which are not a complete or fitting subject for a separate enactment by the legislature. Although that may not have been intended, there is nothing in that provision which warrants the inference or conclusion that the governor's power of partial veto was not intended to be as coextensive as the legislature's power to join and enact separable pieces of legislation in an appropriation bill ...." *Id.* at 314–315.

Hence, from the very first case on the question, this court has recognized that what was struck by the governor did not have to be "separable" as an item;

instead, this court has recognized that what the legislature has assembled, the governor can disassemble "part" by "part."

The court further noted in *Henry* that, unlike other states, nothing in this state's constitution prohibits the legislature from passing a bill containing more than one subject.[5] Thus, in *Henry,* the court determined that the governor in this state, in the exercise of his "quasi-legislative function," has a coextensive power of partial veto in order to "check or prevent the evil consequences of improper joinder ..." in an appropriation bill. *Id.* at 315.

In rejecting the challenge to Governor LaFollette's partial vetoes in *Henry,* this court developed the following standard defining the governor's partial veto authority: (1) the bill must be an appropriation bill; however, (2) the part the governor objects to need not involve an appropriation; but, (3) the approved portion must constitute a complete, entire and workable law. *Id.* at 313–314. *See also,* Harrington, 60 *Marq. L. Rev., supra,* at 879.

The next case to deal with the governor's partial veto power was *State ex rel. Finnegan v. Dammann,* 220 Wis. 143, 264 N.W. 622 (1936). In that case this court held that the governor's partial veto power may be exercised only with respect to an appropriation bill, not a revenue bill. The principle was reiterated that the partial veto power applies even to those parts of an appropriation bill not dealing with appropriations; however, it was emphasized that the bill upon which the veto was exercised must contain an appropriation

---

[5]The only such limitation is found in art. IV, sec. 18, Wis. Const., with respect to private and local bills.

within its four corners rather than merely affecting another law which contains an appropriation. *Id.* at 147–149. The *Finnegan* case is significant because it again recognized this court's broad and expansive interpretation of the scope of the governor's partial veto authority with respect to *parts* of an appropriation bill.

The next case, *State ex rel. Martin v. Zimmerman,* 233 Wis. 442, 289 N.W. 662 (1940), reemphasized the uniquely broad sweep of the partial veto authority of the Wisconsin governor granted in art. V., sec. 10. In that case, in upholding the governor's veto of whole sections, subsections and paragraphs of an appropriation bill, this court stated that the question presented was "whether the approved parts, taken as a whole, provide a complete workable law." *Id.* at 450. Moreover, in *Martin,* this court emphasized that the test focuses on the parts of the appropriation bill remaining after the governor's exercise of his partial veto. This court wrote:

> "No contention is made in the instant case that the *parts* of Bill No. 563, S., approved by the governor do not *leave* a complete body of law of proper subject matter for a separate enactment by the legislature. We think it clear that ch. 533, Laws of 1939, which contains all of Bill No. 563, S., excepting the *parts* thereof disapproved by the governor, constitutes an effective and enforceable law on fitting subjects for a separate enactment by the legislature." (Emphasis supplied.) 233 Wis. at 449.

Also of significance is the *Martin* court's recognition of the purpose of the amendment to art. V, sec. 10. Echoing the earlier remarks of Governor McGovern regarding the evils of the legislature's enactment of

"omnibus" appropriation bills,[6] this court in *Martin* stated the purpose of art. V, sec. 10, was:

> ".... to prevent, if possible, the adoption of omnibus appropriation bills, logrolling, the practice of jumbling together in one act, inconsistent subjects in order to force a passage by uniting minorities with different interests when the particular provisions could not pass on their separate merits, with riders of objectionable legislation attached to general appropriation bills in order to force the governor to veto the entire bill and thus stop the wheels of government or approve the obnoxious acts. Very definite evils were inherent in the lawmaking processes in connection with appropriation measures. Both the legislature and the people deemed it advisable to confer power upon the governor to approve appropriation bills in whole or in part ...." 233 Wis. at 447–448.[7]

This language has been quoted in subsequent cases and has been paraphrased by the petitioners in the instant case in support of their argument that the explicit purpose of the governor's veto power is solely to prevent logrolling.[8] The definition of logrolling the

---

[6]*See* Harrington, 60 *Marq. L. Rev., supra,* at 876.

[7]In *Martin,* "logrolling"—objectionable or not in the particular case—was recognized as an inherent component of an omnibus appropriation bill where the combining of inconsistent subjects in one bill is not contrary to the state constitution. Thus, "logrolling" has a special definition in the context of the omnibus bill and partial veto. It is not the practice prohibited by law and described below in this opinion. Rather, it is a practice whose use in an omnibus bill may be correctable by the partial veto.

[8]That this argument is faulty is made manifest by prior decisions of this court where partial vetoes sustained had nothing to do with control of "logrolling" or "jumbling together" of

*Martin* court apparently had in mind is consistent with the definition that term is given in other jurisdictions. *Black's Law Dictionary,* 5th ed., p. 849 (1979) defines logrolling as:

> "A legislative practice of embracing in one bill several distinct matters, none of which, perhaps, could singly obtain the assent of the legislature, and then procuring its passage by a combination of the minorities in favor of each of the measures into a majority that will adopt them all."

Variations on this definition of logrolling have been followed in other states, especially those with constitutional prohibitions against having a bill relate to more than one subject. For example, in *Gillert v. State of Alaska,* 522 P.2d 1120, 1122 (Alaska 1974) the Alaska Supreme Court described logrolling as deliberately inserting in one bill several dissimilar or incongruous subjects in order to secure the necessary support for the passage of the measure. The Washington Supreme Court in *Flanders v. Morris,* 88 Wash. 2d 184, 558 P.2d 769 (1977) recognized that the constitutional provision that no law shall contain more than one subject, which shall be expressed in the title, has a dual purpose:

inconsistent subjects, *e.g., State ex rel. Sundby v. Adamany,* 71 Wis. 2d 118, 237 N.W.2d 910 (1976), where the governor's partial veto had the effect of making mandatory certain referenda that the legislature had made optional, and *State ex rel. Kleczka v. Conta,* 82 Wis. 2d 679, 264 N.W.2d 539 (1978), which upheld a partial veto that changed the add-on option for financing publicly financed campaigns to a check-off option. In neither of these cases was the approval of the governor's partial veto by this court conditioned on the theory that the particular vetoes had the effect of controlling or eliminating logrolling. *See* discussion *infra* re the obvious meaning of "logrolling" as expressed by the proponents of the 1930 amendment and as expressed by previous opinions of this court.

"(1) to prevent 'logrolling,' or pushing legislation through by attaching it to other necessary or desirable legislation, and (2) to assure that the members of the legislature and the public are generally aware of what is contained in proposed new laws." 88 Wash. 2d at 187.

Additionally, in *Wass v. Anderson*, 312 Minn. 394, 399, 252 N.W.2d 131 (1977), the Minnesota Supreme Court described logrolling as "'the attachment of undesirable "riders" upon bills certain to be passed because of their public popularity or desirability.' 1A Sutherland, *Statutory Construction*, (4th ed.), sec. 17.01." *See also,* M. Ruud, "No Law Shall Embrace More Than One Subject," 42 *Minn. L. Rev.* 389 (1957).

From these selected cases, it appears that the generally accepted definition of logrolling includes the concept of joining unrelated provisions and creating a union of interests to secure passage of the legislation. It is interesting that the *Martin* court identified anti-logrolling as the purpose of the constitutional amendment giving the Wisconsin governor a partial veto power, inasmuch as Wisconsin has never recognized any prohibition—constitutional or statutory—against submitting omnibus bills dealing with a broad range of unrelated topics. This is especially true with respect to the "omnibus" biennial budget bills. *See Milwaukee Brewers v. DH&SS*, 130 Wis. 2d 79, 83, 387 N.W.2d 254 (1986). By definition, such "logrolling" is implicitly acceptable in the budget bill.

Article IV, sec. 18 of the Wisconsin Constitution only prohibits private or local bills embracing more than one subject; that provision further requires that the subject be expressed in the title. It thus appears that Wisconsin has always condoned "logrolling" in the sense that this state has never prohibited the

445

inclusion of substantive legislation in appropriation bills and has never adopted a "one-bill-one-subject" limitation on bills other than the private and local limitation. *See State ex rel. Wisconsin Telephone Co. v. Henry,* 218 Wis. 302, 315, 260 N.W. 486 (1935).

If indeed the partial veto authority granted the governor by the constitutional amendment ratified in the 1930 general election was intended to prevent "logrolling" in the traditional sense, it was a particularly ill-suited and cumbersome way to achieve that goal—especially in the absence of any concomitant legislation or self-imposed legislative rule outlawing the practice. The partial veto power in this state was adopted not to prevent the crime of logrolling, but more importantly, to make it easier for the governor to exercise what this court has recognized to be his "quasi-legislative" role, and to be a pivotal part of the "omnibus" budget bill process. The 1930 amendment provided for a gubernatorial control mechanism to put some limit on constitutionally sanctioned logrolling, the "jumbling together in one Act" of inconsistent subjects. What was "objectionable" under the 1930 amendment was left to the governor for excision under the partial veto power.

This conclusion is bolstered by the fact that this state has since 1911—19 years before the partial veto constitutional amendment—had a statute specifically prohibiting a defined type of logrolling. This legislative prohibition is now found in sec. 13.05, Stats. This statutory prohibition aimed at preventing individual legislators from exchanging votes—i.e., reciprocal voting for each other's separate bills—has remained relatively unchanged since its 1911 adoption. Sec. 13.05, provides:

"**Logrolling prohibited.** Any member of the legislature who gives, offers or promises to give his vote or influence in favor of or against any measure or proposition pending or proposed to be introduced, in the legislature in consideration or upon condition that any other person elected to the same legislature will give or will promise or agree to give his vote or influence in favor of or against any other measure or proposition pending or proposed to be introduced in such legislature, or who gives, offers or promises to give his vote or influence for or against any measure on condition that any other member will give his vote or influence in favor of any change in any other bill pending or proposed to be introduced in the legislature may be fined not less than $500 nor more than $1,000 or imprisoned not less than one year nor more than three years or both."

In any event, it is clear that the governor's partial veto authority would be a particularly ill-suited method of preventing or attacking the type of logrolling statutorily defined in sec. 13.05: How could the governor know if there had been a reciprocal exchange of votes? And why would he need to use his partial veto power to rectify this practice in view of the anti-logrolling statute on the books since 1911? The *Martin* court could not have been referring to the statutory crime of "logrolling."

Although governors continued to use the partial veto after the *Martin* decision, *see* Legislative Reference Bureau, "The Use of the Partial Veto in Wisconsin," *Information Bulletin,* 75–IB–6, p. 7 (1975), there was a 35-year hiatus until the next judicial challenge was brought to a governor's exercise of his partial veto authority. In *State ex rel. Sundby v. Adamany,* 71 Wis. 2d 118, 237 N.W.2d 910 (1976), the challenge was to

447

the governor's veto of two clauses in one subsection of a bill resulting in the elimination of legislatively adopted procedures for local governments to exceed their levy limits. That veto replaced those legislatively prescribed procedures with procedures the governor had initially proposed in his original executive budget bill. This court upheld the governor's exercise of his partial veto authority and reaffirmed the earlier test identified in *Henry* and *Martin,* stating:

> "Thus, *Henry* and *Martin* establish the principle that the partial veto power may be utilized to veto any portion of a bill, whether the portion itself is an item of appropriation or not, even if the result effectuates a change in legislative policy, as long as the portion vetoed is separable and the remaining provisions constitute a complete and workable law." 71 Wis. 2d at 130.[9]

In *Sundby,* this court again recognized that the governor may object to portions of an appropriation bill which are not themselves concerned with specific appropriations. This court, in *Sundby,* stated:

> "We conclude the action taken by the governor was valid, in that the portions vetoed, although not actually items of appropriation, were separable provisions, not constituting provisos or conditions to an item appropriation, and the remaining portions constitute a complete and workable law." *Id.* at 135.

Moreover, in *Sundby,* this court specifically rejected the argument that the governor's veto can only operate negatively and can never bring about an affirmative change in the result intended by the

---

[9]The question of separability was decided in *Henry* and *Martin* and restated in *Kleczka.*

448

legislature. This court said that it was not "impressed" by that distinction because "every veto has both a negative and affirmative ring about it." *Id.* at 134.

The latest case dealing with the governor's partial veto authority, *State ex rel. Kleczka v. Conta,* 82 Wis. 2d 679, 264 N.W.2d 539 (1978), was decided by this court a decade ago. In *Kleczka,* this court upheld the governor's exercise of his partial veto authority which had resulted in changing a legislatively proposed "add-on" to a "check-off" system on taxpayers' returns to finance the state public campaign fund. This court once again reaffirmed the broad power granted to the governor to veto *parts* of appropriation bills.

Furthermore, the *Kleczka* decision is significant for our present analysis because it finally jettisoned the idea that the governor's partial veto could not operate on "provisos or conditions" the legislature had placed upon an appropriation. In *Kleczka,* this court pointed out that prior cases so stating were dicta and had relied on cases from other jurisdictions involving different and more restrictive constitutional provisions than the partial veto authority granted the Wisconsin governor. *Id.* at 714–715. This court clarified that under Wisconsin law, the governor may exercise his partial veto power by removing provisos and conditions to an appropriation "so long as the net result of the partial veto is a complete, entire and workable bill which the legislature could have passed in the first instance." *Id.* at 715.

The *Kleczka* decision is also significant because it once again stated that the test for determining whether the part vetoed was "severable" focuses on the result remaining after the veto:

"We conclude that the test of severability has clearly and repeatedly been stated by this court to be simply that what remains be a complete and workable law. The power of the Governor to disassemble the law is coextensive with the power of the Legislature to assemble its provisions initially." *State ex rel. Kleczka v. Conta,* 82 Wis. 2d at 707–708.

■

From this quintet of nearly unanimous decisions—one justice dissented in *Kleczka*—several controlling principles can easily be extracted. First, the governor of Wisconsin under this state's constitution has been granted a uniquely broad and expansive power to veto *parts* of an appropriation bill. This partial veto authority is broader than the item veto authority granted governors in other states and was adopted in this state to give the governor flexibility to deal with omnibus appropriation bills. As noted, in Wisconsin, unlike other states, such omnibus appropriation bills are permissible.[10] Second, in this state

---

[10]The Wisconsin Constitution does not prohibit substantive legislation from being included in appropriation bills. Consequently, prior governors as well as prior legislatures have frequently included major policy initiatives in the budget bill; indeed, one commentator has described the budgetary process as *the* policy-making process in this state. *See,* J. Gosling, "Patterns of Influence and Choice in the Wisconsin Budgetary Process." *Legislative States Quarterly,* vol. 10 (Nov. 1985) pp. 457–482. *See also,* J. Gosling, "Wisconsin Item-Veto Lessons," 46 *Public Administration Review,* 292, 294 (July/Aug. 1986).

Furthermore, as stated supra, this state's constitution does not impose a "one bill one subject" limitation on bills other than the private and local limitation found in art. IV., sec. 18. *See* note 5, *supra,* and accompanying text. *See also, State ex rel. Wisconsin Telephone Co. v. Henry,* 218 Wis. 302, 315, 260 N.W. 486 (1935), and

the governor may exercise the partial veto authority over conditions or provisos attached to the appropriation bill; and third, the partial veto may be affirmative as well as negative in effect. This court has in the context of our prior cases repeatedly recognized that the limitation on the exercise of the governor's partial veto authority is that what remains after the veto must be a complete and workable law. As was specifically adumbrated in *Henry,* the governor has the power to dissever portions of "a single piece of legislation which is not severable ...." *Henry,* 218 Wis. at 314.

Although we have recognized that the governor has quasi-legislative power with respect to the exercise of his partial veto authority, and that he can be creative in the exercise of such authority, we have never before had reason to identify what appears to be an inherent "germaneness" limitation on the governor's partial veto authority. We do so here because the question was posed in oral argument. From 1931 through October of 1987, the governors of this state exercised the partial veto authority over appropriation bills a total of 988 times. *See* Legislative Reference Bureau, "The Partial Veto in Wisconsin—An Update," *Informational Bulletin,* 87–IB–3, p. 7 (October 1987). Some of those partial vetoes were challenged in court or by seeking an opinion from the Attorney General. However, in none of those reported challenges did the governor's partial vetoes result in the creation of totally new, unrelated or non-germane provisions.

*Milwaukee Brewers Baseball Club v. DH&SS,* 130 Wis. 2d 79, 106–17, 387 N.W.2d 254 (1986).

Indeed, with respect to the 290 partial vetoes exercised by the present governor in the 1987–89 budget bill, the summary of those vetoes prepared by the Legislative Fiscal Bureau and reprinted in the parties' Stipulation of Facts submitted in this case indicates that all resulted in provisions that were directly related to the subject matter of the vetoed provisions. More precisely, focusing on the 37 specifically challenged partial vetoes involved in the instant case, it is clear that all of the new provisions resulting from those vetoes involve the same subject matter as the original legislative enactment. From this it can be inferred that all chief executives of this state, including the present incumbent, have perceived and recognized an implicit "topicality" or "germaneness" limitation on their partial veto authority.[11] We deem the long-standing recognition of this limitation to be a practical construction of the relations between the governor and legislature. As this court stated in *State ex rel. Reynolds v. Zimmerman,* 22 Wis. 2d 544, 558, 126 N.W.2d 551 (1964):

> "In issues relating to the relative power of co-ordinate branches of government, the view of the constitutional allocations of power adopted by the political branches of government will be given great weight by the court when called upon to make an authoritative judicial determination of the scope of authority."

[11]This implicit germaneness limitation is consistent with Senate Rule 50 and Assembly Rule 54, which require that any legislative amendments to legislative proposals must be "germane" to the subject or intent of the original proposal.

This germaneness limitation on the governor's partial veto authority is a practice which we recognize as having achieved the force of law. *See State ex rel. Frederick v. Zimmerman,* 254 Wis. 600, 37 N.W.2d 473 (1949).

This broad and expansive interpretation of the governor's partial veto authority as mandated by the constitution has, in effect, impelled this court's rejection of any separation of powers-type argument that the governor cannot affirmatively legislate by the use of the partial veto power. Instead, this court had adopted an objective test permitting the affirmative use of the partial veto power as long as the parts remaining after the veto are a complete and workable law. This objective test has been called an "attractive alternative" to the subjective test used in other jurisdictions, *see* Harrington, *supra,* at 825. Under this objective test the governor can initially determine whether the parts of an appropriation bill remaining after a partial veto will be a "complete and workable" law. On the other hand, the subjective test, which holds that the governor's item veto can only be used negatively, often necessitates court action in order to determine whether an item veto has an affirmative or negative effect. Again, it must be noted that Wisconsin's objective test is premised on the language of our constitution giving the governor of this state the authority to veto *parts* of an appropriation bill, as distinguished from other states which grant their governors the authority to veto *items* of appropriations. Nonetheless, it is interesting to note that even though the State of Washington appears to be an "item" veto state, *see* art. III, sec. 12, Wash. Const., the Washington Supreme Court has recently abandoned

the affirmative/negative test and has recognized that when such argument is raised, the appropriate "check" on the exercise of gubernatorial item vetoes is the legislature's two-thirds override opportunity. *Washington Federation of State Employees v. Washington,* 101 Wash. 2d 536, 682 P.2d 868 (1984). *See also, Karcher v. Kean,* 92 N.J. 483, 479 A.2d 403 (1984).

As we have pointed out, the partial veto authority in this state was adopted in an effort to provide the chief executive with some flexibility in dealing with omnibus appropriation bills submitted by the legislature. In general, the legislative power of this state, including the power to pass appropriation bills is vested in the Senate and Assembly. Art. IV, sec. 1 and art. VIII, sec. 2 Wisconsin Constitution. However, with respect to appropriation bills, the governor has a specially constitutionally recognized role in such legislation. *State ex. rel. Sundby v. Adamany, supra,* 71 Wis. 2d at 134. The governor exercises his "quasi-legislative function" regarding appropriations via his partial veto authority. *State ex rel. Wisconsin Telephone Company v. Henry, supra,* 218 Wis. at 314, 315. The grant of the partial veto power to the governor of this state was not aimed at preventing statutorily defined "logrolling"; it was aimed at controlling that practice as it was defined in *Henry.* It was also aimed at achieving joint exercise of legislative authority by the governor and the legislature over appropriation bills. It gave the governor a constitutionally recognized role in the legislative budgetary function. The legislature itself has recognized the governor's legislative role in the budget area by ceding to the governor the initial responsibility for preparing the biennial budget report and requiring him to submit his execu-

tive budget bill together with suggestions for the best methods for raising the needed revenues. *See* sec. 16.45, *et seq.,* Stats. It was no coincidence that the same 1929 legislature which passed Laws of 1929, ch. 97, adopting the executive budget system for this state, thereby creating a statutory role for the governor in the budgetary process, also passed—for the requisite second time—the the joint resolution proposing the constitutional amendment to art. V, sec. 10 to provide for the governor's partial veto authority. These acts were all part of the complete overhaul of the budget system in this state that took place at that time. The partial veto power the governor may exercise over appropriation bills is simply one tool he has for controlling his own executive budget bill. If the legislature wanted to restrict the governor's partial veto authority to only items of appropriation, it could simply submit only true appropriation bills to the governor and eliminate its practice of enacting omnibus budget bills laden with legislative policy initiatives which the governor is then free to veto. In other words, if the legislature wants to insulate its initiatives from the governor's partial veto, it should make sure that it submits its policy legislation as individual, general bills, and not include such enactments in the budget bill.

We do not address the question of whether such action would constitute preferred public policy. We give as an example, however, that in sec. 39 of the 1987–89 budget bill, the legislature "repealed and recreated" sec. 15.157(1), Stats., dealing with the creation and makeup of the Council of International Trade in the Department of Development. The gover-

nor vetoed[12] the words and text following "repealed." Thus, the governor's partial veto on this item resulted in sec. 39 of the budget bill reading: "15.157(1) of the statute is repealed." We find no merit to the petitioners argument that the governor could not exercise his partial veto authority in this manner. The legislature chose to repeal and recreate sec. 15.157(1), within the four corners of the omnibus budget bill. That legislative enactment—even though it was not itself an appropriation—therefore, became subject to the governor's partial veto authority. *State ex rel. Wisconsin Telephone Co. v. Henry, supra,* 218 Wis. at 313–14; *State ex rel. Finnegan v. Dammann, supra,* 220 Wis. at 147–49; and *State ex rel. Sundby v. Adamany, supra,* 71 Wis. 2d at 135.

Although our prior decisions interpreting the governor's partial veto authority over appropriation bills may have dictated the result we reach today validating these challenged vetoes of letters and words, none of our prior cases has answered the question of whether the governor may reduce a legislatively enacted appropriation. While our prior cases have indicated that with a single stroke, the governor can turn a statutory proscription into a prescription, we have never specifically held that the governor may similarly reduce an appropriation. We conclude that he may.

The petitioners identify 16 instances in the 1987–89 budget bill where the governor, purporting to exercise his partial veto authority, reduced the appropriation. In four of those instances, the governor

---

[12]Item D–21, one of the 37 specifically challenged vetoes in this case.

reduced the appropriation by striking digits,[13] and in twelve instances the governor eliminated the appropriation entirely.[14]

We conclude, consistent with the broad constitutional power we have recognized the governor possesses with respect to vetoing single letters, words and parts of words in an appropriation bill, that the governor has similar broad powers to reduce or eliminate numbers and amounts of appropriations in the budget bill. The governor has been authorized by the legislature and the people in art. V, sec. 10 of our constitution to approve appropriation bills "in part." Again, the test in the veto of parts is simply whether what remains after the governor's veto is a complete and workable law.

We recognize that the majority of the jurisdictions that have considered this issue—under an "item" veto constitutional provision—have concluded that the governor has no such authority on the rationale that a reduction in an appropriation is, in effect, a veto of part of an item, and thus a type of veto not authorized. *See* Committee Print, *supra,* at 157, *et seq. See also, Wheeler v. Gallet,* 43 Idaho 175, 249 P. 1067 (1926). Contrarily, in Wisconsin, where the veto authority is phrased in terms of disapproving *parts* of

---

[13]*See, e.g.,* Item D–36, where the governor vetoed "1" in the $150,000 appropriation for the Waste Reduction and Recycling Grant Program for 1987–88 and 1988–89.

[14]*See, e.g.,* Item D–35, where the governor vetoed all of the digits in certain appropriation amounts in secs. 131m and 132 of the budget bill except for the last "0." In two other challenged instances, the governor reduced numbers, other than appropriations by striking single digits in the text of the budget bill. *See,* item D–38 and E–23.

457

an appropriation bill, we conclude that the governor has the power to reduce appropriations by striking the numbers or digits he deems appropriate as well as to eliminate the appropriation entirely.

Moreover, although our constitution does not specifically provide the governor with authority to reduce items of appropriation, that power is implicit. *See Commonwealth ex rel. Elkin v. Barnett,* 199 Penn. 161, 48 A. 976 (1901), and *Karcher v. Kean,* 97 N.J. 483, 479 A.2d 403 (1984). The New Jersey Constitution, analogous to that of Wisconsin, provides that if any bill is presented to the governor which contains one or more items of appropriation, the governor may object "in whole or in part to any such items or items while approving the other portions of the bill ...." New Jersey Constitution, art. V, sec. 1, para. 15. In *Karcher,* the New Jersey Supreme Court upheld the governor's vetoes which had the effect of reducing state aid appropriations to municipalities. The New Jersey court stated:

> "In sum, because the provisions relating to state aid to municipalities are appropriations, they are subject to the governor's line item veto power. The governor exercised this power with respect to these appropriations in the most traditional and long sanctioned sense. His effectuation of a reduction of a state aid appropriation to eligible municipalities represents precisely the sort of measure that the line item veto power was intended to permit. *See Blanch v. Cordero,* 180 F.2d 56 (1st Cir.) cert. denied, 340 U.S. 819, 71 S. Ct. 49, 95 L.Ed 601 (1950); *Fitzsimmons v. Leon,* 141 F.2d 886 (1st Cir. 1944) (Organic Act of Puerto Rico empowers governor to scale down as well as to disprove items in

appropriation bills since governor may object to an item, part, or portion thereof) ....

"... The governor is empowered to make selective reductions or eliminations of appropriations and discrete elements or parts of included appropriations that he deems excessive, unwise, improper, unlawful, or unconstitutional. This authority reasonably is to be implied in order to avoid a stalemate with the legislature that would arise if the governor were otherwise required either to veto the entire statutory appropriation or to suffer the nullification of his own constitutional responsibility." 479 A.2d at 411 and 416.

In recent years, Wisconsin governors have on occasion attempted to exercise the partial veto authority to reduce an appropriation. *See* Legislative Reference Bureau *Information Bulletin* 87–IB–3 Update, *supra.* Some of those vetoes were challenged by seeking an opinion from the Attorney General regarding their validity. For example, in 1973, then Governor Patrick Lucey partially vetoed a provision in the 1973–75 budget bill by striking the digit "2" from a $25 million highway bonding authorization, thereby reducing it to $5 million. In response to a request, the Attorney General issued an opinion at 62 OAG 238 (1973), stating that the governor's action in vetoing one digit of a separable part of an appropriation bill constituted "an objection within the meaning of art. V, sec. 10, ..." and, thus, had the effect of voiding the entire subsection relating to highway bonding. Further, the Attorney General ventured the opinion that the partial veto authority permitted the governor to "approve or reject" in whole or in part appropriation bills, but did not permit the governor to "*alter*" a separable part of an appropriation bill. Governor

Lucey thereafter acquiesced and advised the legislature to consider that his attempted partial veto was a veto of the entire appropriation.[15]

This court is not bound by the Attorney General's opinion. The opinion is entitled only to such persuasive effect as this court deems it warrants. *State ex rel. La Follette v. Stitt,* 114 Wis. 2d 358, 375, 338 N.W.2d 684 (1983). In this situation, we reject the reasoning of the Attorney General in the 1973 opinion that the governor may not strike a digit from an appropriation because that would amount to an impermissible alteration of the appropriation.[16] Again, we point out that under art. V., sec. 10, of our constitution, the governor may approve appropriation bills "... in whole or in part ...." That provision does not state that the governor may not *alter* appropriation bills.[17]

---

[15]LRB–87–IB–13 Update, *supra,* at 4–6.

Similarly, Governor Lee Sherman Dreyfus used a digit veto to cut $8.9 million appropriated for state school aids in the 1979–81 budget bill. He accomplished this by vetoing the decimal point and number 9 from the percentage "96.9%," thereby decreasing the percentage used for calculating a portion of such school aids. That veto was not challenged, and the legislature subsequently failed to override it. LRB–87–IB–3 Update at p. 5.

[16]Nor do we agree with that opinion with respect to the effect of a defective partial veto.

[17]Because the question is not raised by the facts of this case or any of the vetoes specifically challenged, we do not decide the issue of whether the governor may reduce appropriations by writing in a different and smaller number than that passed by the legislature, rather than by adjusting figures that the legislature had originally provided. We note, however, that in *Karcher,* the New Jersey governor, by utilizing his line-item veto, changed a legislatively prescribed percentage and changed the aid limits set by the legislature from $140 million to $125 million. The effect of these

Clearly, if an appropriation bill is approved only in part, it is altered. Therefore, we reject the Attorney General's conclusion that the governor may not exercise his partial veto authority to reduce and thereby alter appropriations bills. Instead, we agree with the reasoning of the New Jersey court in *Karcher v. Kean, supra.* We hold that a partial veto resulting in a reduction in an appropriation is precisely the sort of partial veto measure the governor of this state is authorized to take pursuant to art. V, sec. 10 Wis. Const.[18]

changes was to reduce the amount of state aid to specified municipalities by $32 million.

[18]The petitioners note that a brief prepared by Edwin E. Witte, Chief of the Wisconsin Legislative Reference Library in September of 1930 in support of the proposed amendment to art. V, sec. 10 which was on the ballot for the upcoming November general election, stated: "the Wisconsin amendment does not allow the governor to reduce items, but only to veto them entirely ...." According to the petitioners, this contemporaneously produced document provides direct authority for holding that the amended art. V, sec. 10, was never intended to give the governor of this state the power to reduce appropriations.

We are not persuaded of the significance of the Witte brief. In the first place, its impact on the issues raised in this case is weakened by Witte's erroneous statements throughout the brief that the proposed amendment would give the governor "item" veto authority. Furthermore, we question whether contemporaneously written briefs aimed at garnering political support for a proposed constitutional amendment can ever be considered persuasive when a court later attempts to interpret the constitutional provision that was amended. Even if Witte could accurately be called the drafter of this amendment, the amendment to the constitution was accomplished in the usual manner, including passage by two consecutive legislatures and approval and ratification by the people of Wisconsin at the general election. Art. XII, sec. 1, Wis. Const. Thus, unlike the situation where the court must

■Again, we point out that our five earlier decisions which have broadly construed the governor's partial veto authority, have ineluctably led to the decision we reach today. Our conclusion that the governor has the authority to veto sections, subsections, paragraphs, sentences, words, parts of words, letters, and digits included in an appropriation bill as long as what remains is a complete and workable law, should not be read to mean that we give our imprimatur to the remaining provisions for all purposes. We have only determined that the challenged vetoes are valid in the sense that the result—i.e., the 1987–1989 biennial budget bill, which became 1987 Wis. Act 27 when the governor approved it in part on July 31, 1987,—was a complete and workable law. We express no opinion regarding other specific challenges that might be raised to the provisions in that act. We refrain from resolving in this opinion the petitioners' claim that some of the challenged vetoes are invalid because the resulting provisions are inartful, clumsy, ungrammatical or incomprehensible.[19] We note, however, that the test applied to determine the validity of the governor's

ascertain legislative intent for a statutory enactment, *cf. State Historical Society v. Maple Bluff,* 112 Wis. 2d 246, 255, 332 N.W.2d 792 (1983), this contemporaneously written account of what Witte thought the proposed constitutional amendment meant, is not persuasive as to what the amendment actually did. Nor do we find it persuasive that an earlier proposed amendment that would have allowed the governor to reduce appropriations but which did not have the prescribed approval of the legislature, never went to referendum, and hence was a nullity, is evidence that it would be contrary to the intent (of whom? the legislature? the people?) of the amendment as passed to permit reduction of an appropriation.

[19]*See, e.g.,* Item E-16.

partial vetoes is not one of grammar. The only requirement is that the result remaining after the partial veto is a "complete and workable law." *Kleczka, supra,* 82 Wis. 2d at 707–08. Awkward phrasing, twisted syntax, alleged incomprehensibility and vagueness are matters to be resolved only on a case-by-case basis in which specific challenges to discrete applications of the new provisions are raised in a complete factual setting.

With the exception of our conclusion upholding the exercise of the governor's partial veto powers resulting in the reduction of appropriations and our making explicit what was implicit,—i.e., the germaneness requirement—this case makes no new law. Instead, we simply reaffirm our prior opinions which have placed Wisconsin in the singular position of having the most liberal and elastic constitutional provision—adopted almost 60 years ago—regarding the governor's partial veto authority over appropriation bills.[20]

The concurring-dissenting opinion in footnote 1 posits a hypothetical that is brilliantly probative of the rationale expressed in this opinion at p. 410, wherein it is pointed out that the legislature has within its own power the ability to protect its own initiatives from the governor's constitutional partial

---

[20]For an exhaustive comparative analysis of the "item" veto provisions in state constitutions, *see Committee Print, supra.* That document entitled "Item Veto: State Experience and Its Application to the Federal Situation" was prepared by the Committee on Rules of the House of Representatives for its consideration of and response to President Ronald Reagan's repeated proposals that the President, like the governors of 43 states, be given, by statute or constitutional amendment, item veto authority over appropriation bills.

veto power by enacting "individual, general bills and not include such enactments in budget bills." While, as the concurring-dissenting opinion points out, the hypothetical governor's veto of the felony murder statute, sec. 940.03, contained in 1987 Wisconsin Act 399 is "intolerable," to include such legislation relating to the criminal law in an appropriation bill, when such legislation is totally removed from any fiscal concerns, and then to assume it will be insulated from the governor's partial veto power, is little short of fatuous.

Act 399 is loaded with non-fiscal legislative policy determinations, all of which have been interjected into an appropriation bill. Clearly, the legislature faces a dilemma. From its point of view there are obviously good reasons to do exactly that—some are political, some practical, and some make good sense administratively—to "jumble together" unrelated bits of legislation. But the legislature cannot have it both ways. Practical and sensible expediency may in fact dictate a continuation of the present practice, but it is this practice, the "jumbling together" of unrelated pieces of legislation—as demonstrated in the concurring-dissenting opinion's example—that is the invitation to "terrible abuse."

The solution is obvious and simple: Keep the legislature's internally generated initiatives out of the budget bill (unless the legislature is prepared to face the possibility of a partial veto), or amend the constitution to provide for an "item" veto, and not a veto of "parts" of an appropriation bill. It is fantasy to continue to adhere to the notion that the governor's partial veto power is of "items" only. For 60 years this court has asserted and reasserted that art. V, sec. 10 of the Wisconsin Constitution is a veto power in respect

to "parts" and not to "items." This assertion, repeated in case after case as a decisional holding by this court should be taken seriously. If the legislature and people wish the governor to have only the power to veto items in an appropriation bill, a constitutional amendment may be desirable. It should, however, be understood that this court has no power to toy with the constitutional grant of a partial veto to the governor and to replace it with a veto power that may be more sensible and palatable. Any claimed excesses on the part of the governor in the exercise of this broad partial veto authority are correctable not by this court, but by the people, either at the ballot box or by constitutional amendment.

By the Court.—It is declared and adjudged:

(1) That those parts of enrolled 1987 Senate Bill 100 passed by the legislature but vetoed by the governor pursuant to art. V., sec. 10 of the Wisconsin Constitution, were, in accordance therewith, duly vetoed and returned to the legislature with the governor's objections thereto, and were then refused passage.

(2) That by virtue of passage by the legislature and approval in part by the governor, 1987 Wisconsin Act 27 was validly enacted, and, upon the publication thereof, in accordance with sec. 21, art. VII, of the constitution, and sec. 991.11, Stats., became and now is in force and effect as law.

No questions concerning the validity of 1987 Wisconsin Act 27, other than those relating to the approval, enactment, and publication thereof, are now determined.

Relief denied.

BABLITCH, J. *(dissenting in part, concurring in part).*

> "Governor to *approve* or *veto* bills. ... Appropriation bills may be *approved* in whole or in part ... and the part approved shall become law, and the part objected to shall be returned in the same manner as provided for other bills." (Emphasis added.) Article V, Sec. 10, Wis. Const.
>
> *approve:* "1. to give one's consent to; sanction; confirm. ..." Webster's New World Dictionary (2d ed. 1972).
>
> *veto:* "1. a) an order prohibiting some proposed or intended act; prohibition, esp. by a person in authority b) the power to prevent action by such prohibition. ..." *Id.*

I dissent to that portion of the majority opinion which allows a gubernatorial veto of individual letters. Article V, Sec. 10 of the Wisconsin Constitution gives the governor the power to "approve" and the power to "veto." It does not give the governor the power to create. The power to create is so far removed from the plain meaning of the words "approve" and "veto" that to so interpret Art. V, Sec. 10 strains the English language beyond the breaking point. Yet that is precisely the result of the majority's opinion. The veto of single letters can have but one purpose: to create new words. These new words when joined with others, necessarily create new legislation that in turn becomes law with the approval of as few as 12 members of the legislature. The majority opinion allows the governor to creatively legislate with a few strokes of his pen and the approval of one-third plus one member of one house of the legislature. That simply could not have been the intent of the framers of Art. V, Sec. 10, nor the voters who approved it. It is

an invitation to terrible abuse.[1] Yet the majority, rigidly adhering to the principles of *stare decisis,* says the constitution affords the governor that power. If past cases demand that result, then the principle of *stare decisis* should yield to a result consistent with

[1]For example, the 1987 budget bill, 1987 Wisconsin Act. 399, contains sec. 472zkcp. It reads:

> "940.03 of the statutes is created to read:
> "**940.03 Felony murder.** Whoever causes the death of another human being while committing or attempting to commit a crime specified in s. 940.225(1) or (2)(a), 943.02, 943.10(2) may be imprisoned for not more than 20 years in excess of the maximum period of imprisonment provided by law for that crime or attempt."

With a creative pen, the majority opinion now allows the governor to veto that section as follows:

> "940.03 of the statutes is created to read:
> "**940.03 Felony murder.** Whoever causes the death of another human being while committing or attempting to commit a crime specified in s. 940.225(1) or (2)(a), 943.02, 943.10(2) may be ~~imprisoned for~~ not more than 20 years in excess of the maximum period of imprisonment provided by law for that crime or attempt."

That section would now read as follows:

> "940.03 of the statutes is created to read:
> "**940.03 Felony murder.** Whoever causes the death of another human being while committing or attempting to commit a crime specified in s. 940.255(1) or (2)(a), 943.02, 943.10(2) may be sentenced to death."

With the approval of one-third plus one member of one house of the legislature, the governor has created the death penalty.

Is it germane? Almost unquestionably so.

Is it an abuse of power? *Quaere:* is it an abuse of power to use the power this court says the constitution allows?

Could the framers or the voters have intended this? Clearly not.

the plain meaning of the words within the amend-
ment.

However, past cases from this court do not dictate
this result. I conclude that the history of the amend-
ment and the purposes for its creation, purposes
which this court has consistently relied on but today
abandons, as well as basic constitutional principles,
dictate an opposite result from that reached by the
majority.

## I.

The legislative history of the constitutional
amendment, consistently relied on by this court until
today, and noted at length in petitioner's brief,
indicates that the prevention of logrolling was at the
forefront of the minds of the proponents of the
amendment. The power to veto individual letters is
not necessary to accomplish that purpose.

The majority's opinion attempts to minimize the
significance of the anti-logrolling objective of Article
V, Sec. 10, by noting that "such 'logrolling' is implicit-
ly acceptable in the budget bill" and that "[i]f indeed
the partial veto authority granted the governor by the
constitutional amendment ratified in the 1930 general
election was intended to prevent 'logrolling' in the
traditional sense, it was a particularly ill-suited and
cumbersome way to achieve that goal. ...." Majority
opinion at 15–16. Yet, according to this court's past
interpretations of the constitutional amendment the
prevention of logrolling within a budget bill, albeit
"legal" logrolling, is the paramount purpose behind
the grant of partial veto power to the governor.

Beginning with *State ex rel. Wisconsin Tel. Co. v.
Henry,* 218 Wis. 302, 315, 260 N.W. 486 (1935), this

468

court relied on the anti-logrolling objective of the provision as a justification for upholding the exercise of the governor's partial veto power. The court stated,

"there are reasons why the governor should have a coextensive power of partial veto, to enable him to pass, in the exercise of his *quasi*-legislative function, on each separable piece of legislation or law on its own merits. That is not necessary in many states because they have constitutional provisions which prohibit the legislature from passing a bill which contains more than one subject. Wisconsin, however, has no such prohibition except as to private and local bills. ... Therefore, in order to check or prevent the evil consequences of improper joinder, so far, at least, as appropriation bills are concerned, it may well have been deemed necessary, in the interest of good government, to confer upon the governor, as was done by the amendment in 1930 of sec. 10, art. V, Wisconsin constitution, the right to pass independently on every separable piece of legislation in an appropriation bill." (Emphasis in original.)

In the subsequent decision of *State ex rel. Martin v. Zimmerman,* 233 Wis. 442, 447, 289 N.W. 662 (1940), and more recently in *State ex rel. Sundby v. Adamany,* 71 Wis. 2d 118, 127, 237 N.W.2d 910 (1976), this court again reiterated that,

"we entertain no doubt either as to the reason for, or the meaning of, the 1930 amendment. ... Its purpose was to prevent, if possible, the adoption of omnibus appropriation bills, logrolling, the practice of jumbling together in one act inconsistent subjects in order to force a passage by uniting minorities with different interests when the particular provisions could not pass on their separate

merits, with riders of objectionable legislation attached to general appropriation bills in order to force the governor to veto the entire bill and thus stop the wheels of government or approve the obnoxious act." *Zimmerman,* 233 Wis. at 447.

From the above, it is apparent that the governor's constitutional power of partial veto was primarily intended to serve as a check on the improper joinder of legislation by the legislature in the omnibus budget process. It is only in the context of promoting the anti-logrolling objective of Art. V, Sec. 10, during challenges to a governor's exercise of partial veto authority, that this court has even recognized the governor's constitutional "quasi-legislative" function in the budget process. *See Sundby* 71 Wis. 2d at 133–34. Thus, to argue, as does the majority, that the partial veto power was adopted to facilitate the governor's participation in the omnibus budget process, rather than to curb the practice of legislative logrolling, *see* majority opinion at 416, mischaracterizes the objective of the amendment, the governor's function, and our past cases interpreting the amendment.

In light of the anti-logrolling objective of Art. V, Sec. 10, the majority's expansion of the governor's partial veto power to strike individual letters within an appropriation bill goes far beyond what is necessary to accomplish that objective. The governor already possesses the power to strike individual words, phrases and paragraphs within the budget bill and, thus, effectively disassemble any objectionable provision. The power to eliminate individual letters does not enhance the governor's ability to combat "the practice of jumbling together in one act inconsistent subjects in order to force a passage by uniting minorities with different interests when the particular

provisions could not pass on their separate merits. . . ."
*Zimmerman,* 233 Wis. at 447.

## II.

Equally important, it is a usurpation of the legislature's power to legislate and a violation of the doctrine of separation of powers between the coordinate branches of government to permit the executive branch to create new words and, in effect, new law through the selective excision of individual letters. The power to legislate, and determine policies and programs, is vested exclusively in the senate and assembly. Art. IV, Sec. 1, Wis. Const.; Sec. 15.001, Stats. While the governor has been granted the constitutional power to convene the legislature on extraordinary occasions, to recommend expedient matters for the legislature's consideration, to direct the preparation of the state biennial budget and to approve the legislature's appropriation bills in whole or part, there is nothing in the constitution which authorizes the governor to enact new legislation. *See* Art. V, Secs. 4, 10, Wis. Const.; Sec. 16.46.

However, by granting the governor the power to enact new, albeit "germane," legislation from the array of letters contained within the budget bill, this court has given the governor extraordinary legislative power surpassing even that of the legislature. Ordinarily, for a bill to become law it must pass both houses of the legislature with a majority vote in each, and then be approved by the governor. Under the power given the governor in the majority opinion, the governor can create new words by the stroke of his pen and, with the acquiescence of one-third plus one member of just one house of the legislature, new law.

The majority opinion also overlooks an important limitation on the governor's ability to "check" the practice of improper joinder of legislation. That limitation, enunciated in this court's decision of *State ex rel. Kleczka v. Conta,* 82 Wis. 2d 679, 707–708, 264 N.W.2d 539 (1978), is that "[t]he power of the Governor to disassemble the law is coextensive with the power of the Legislature to assemble its provisions initially." *See also Henry,* 218 Wis. at 315. This additional limit on the governor's partial veto power is significant because, in contrast to the requirement that what remains after the exercise of the veto "be a complete and workable law," the former restricts the exercise of the gubernatorial veto rather than simply limiting the end result of the exercise of that power.

In failing to consider the "coextensive" limit on the governor's veto power when granting the governor the power to excise individual letters, the majority has created an imbalance of power between governor and legislature. In effect, the majority has given the governor greater power to disassemble than the legislature exercises in assembling legislation. As a practical matter, legislators do not assemble legislative provisions by proposing and arranging individual letters. Rather, bills are based on concepts which are in turn built from words, sentences and paragraphs— each of which have individual meaning and contribute to the ultimate meaning of legislation. Thus, to grant the governor a power to disassemble which exceeds the legislature's power to assemble abrogates the limit of coextensive power set forth in *Kleczka* and our previous decisions.

There is a further imbalance created by the majority opinion. Up to now, as the legislature assembled a bill containing an appropriation, they did so

under the principle of *Kleczka* that the words they were assembling were subject to disassembling by the governor. They could, by their choice and limitation of words, circumscribe to some extent the governor's ability to "create" by use of the veto. No more. By holding that appropriation legislation is in essence a potpourri of individual letters, an alphabet soup if you will, the majority has stripped the legislature of any opportunity to circumscribe the parameters of the effects of a gubernatorial veto. The governor is now limited only by the letters in front of him and the extensiveness of his imagination, subject only to the majority's germaneness requirement.

The majority maintains that former precedent has "ineluctably led to the decision we reach today." Slip opinion at 416. I disagaree. This court has never before addressed whether the governor may permissibly strike individual letters from an appropriation bill under his partial veto authority.

While Justice Hansen, dissenting in *Kleczka,* noted the potential abuse of this court's broad interpretation of the partial veto power in *Kleczka,* in particular the governor's ability to reduce a bill to its "single ... letters, digits and punctuation marks," the majority at that time was not confronted with a veto of individual letters. *See Kleczka,* 82 Wis. 2d at 726.

### III.

We need not abandon the principles of *Kleczka* to declare that veto of individual letters goes beyond the power authorized by the partial veto. I would continue to allow the governor the power to veto individual words in an appropriation bill, consistent with the principles of *Kleczka.* As recognized in *Kleczka* as well

as in *Martin, Henry,* and *Sundby,* every veto has both a negative and affirmative effect, and some vetoes will inevitably bring about a change in policy. While the veto of an individual word or words may at times create new policy, that is not always inevitable nor necessarily an intentional result. Further, I agree with that portion of the majority's holding which permits the veto of individual digits to effect a reduction in an appropriation. This power is properly subsumed within the governor's power to veto "in part." Allowing the governor to veto individual words and digits, while requiring that what remains be germane to the section vetoed, provides the governor with ample discretion to exercise his constitutional prerogatives consistent with the separation of powers doctrine.

In sharp contrast, however, stands the governor's new authority to veto individual letters. This power to selectively excise letters can *only* be used with the intent to create new words and, hence, new law. If the principle of *stare decisis* leads us as the majority states, "ineluctably" to this result, then the principle should yield to fundamental precepts and a result consistent with the plain meaning of the words within the amendment. The constitution does not give the governor the power to create and Art. V, Sec. 10 cannot sensibly be interpreted to do so.

Make no mistake, the majority provides the governor with a broad grant of power that, in the judgment of this writer, cannot be tolerated. Certainly the legislature can, as suggested by the majority opinion, attempt to enact a constitutional amendment. But such a process is lengthy and requires a large expenditure of state and local resources. If passed, the parameters of the new language will

undoubtedly be tested in court, thus requiring even more resources. It is not an answer to say that any gubernatorial excesses may be rectified through the ballot box or constitutional amendment, particularly when, as here, any "excesses" in regard to the governor's partial veto power derive primarily from our own pen. It is far better for this court to adhere to the plain meaning of the words within the amendment and longstanding constitutional principles and thus avoid the depletion of limited resources.

I am authorized to state that JUSTICE SHIRLEY S. ABRAHAMSON and JUSTICE DONALD W. STEINMETZ join in this opinion which dissents in part and concurs in part.